IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DAVID EDWARD PECKHAM,                  )    Civil No.: 1:12-cv-02209-JE
                                       )
                 Plaintiff,            )    OPINION AND
                                       )    ORDER
        v.                             )
                                       )
CAROLYN W. COLVIN,                     )
Acting Commissioner of Social Security,)
                                       )
                 Defendant.            )
_____)

        Marlene R. Yesquen
        Black, Chapman, Webber & Stevens
        221 Stewart Avenue, #209
        Medford, OR 97501

            Attorney for Plaintiff

        S. Amanda Marshall, U.S. Attorney
        Adrian L. Brown, Asst. U.S. Attorney
        1000 S.W. 3rd Avenue, Suite 600
        Portland, OR 97204

        Jeffrey Staples
        Special Asst. U.S. Attorney
        Office of the General Counsel
        Social Security Administration
        701 5th Avenue, Suite 2900

            Attorneys for Defendants

OPINION AND ORDER – 1

JELDERKS, Magistrate Judge:

Plaintiff David Peckham brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act (the Act). Plaintiff seeks a judgment remanding the action to the Social Security Administration (the Agency) for an award of benefits.

For the reasons set out below, the Commissioner's decision is affirmed.

## **Procedural Background**

Plaintiff filed applications for SSI and DIB on June 23, 2009, alleging that he had been disabled since November 1, 2004. [1]

After his claims had been denied initially and on reconsideration, Plaintiff timely requested an administrative hearing.

On August 11, 2011, a video hearing was held before Administrative Law Judge (ALJ) David K. Gatto. At the hearing, Plaintiff amended the date of his alleged onset of disability to January 1, 2009. Plaintiff and Edward Pagella, a Vocational Expert (VE), testified at the hearing.

In a decision dated August 26, 2011, ALJ Gatto found that Plaintiff was not disabled within the meaning of the Act. That decision became the final decision of the Commissioner on October 2, 2012, when the Appeals Council denied Plaintiff's request for review. In the present action, Plaintiff challenges that decision.

---

[1] Plaintiff had been found not disabled in a decision dated April 1, 2009 based upon an earlier application for disability benefits.

## Background

Plaintiff was born on June 2, 1969 and was approaching 40 years old when he applied for SSI and DIB benefits and 42 years old at the time of the hearing. Plaintiff completed the 11th grade and has past relevant work experience as a logger and a tree trimmer.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or equal an impairment listed in the

regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the claimant is able to perform relevant work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(f).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(g)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

**Medical Record**

In 1990, Plaintiff jumped off a 192-foot bridge which, Plaintiff alleged, "broke his back." X-rays of Plaintiff's lumbar spine dated February 6, 2006 revealed a mild compression fracture of the superior endplate of the L1 vertebral body.  However, treatment notes dated November 24,

2008 noted that x-rays of Plaintiff's lumbar spine dated November 11, 2008 were "entirely unremarkable" with no compression fracture noted.

In notes of a routine follow-up for gout at the Grants Pass Clinic on February 27, 2009, Plaintiff's treating physician, Dr. Marcel Wiggers, stated that Plaintiff confirmed having stiffness in his knees but denied having swelling, warmth, locking or instability. Plaintiff also denied having any current symptoms relevant to his gout but reported having spasms and stiffness. On examination, Dr. Wiggers noted normal strength and tone bilaterally, and all sensory and reflexes within normal limits bilaterally. Plaintiff exhibited bilateral paraspinal muscle spasm and paraspinal muscle spasm on the right but straight leg tests were negative. Dr. Wiggers diagnosed back pain with normal lumbar x-ray, knee pain with evidence of joint space narrowing on x-ray and "no gout since on allopurinol."

In a visit to Dr. Wiggers on April 27, 2009, Plaintiff complained of pain in his knees and low back. Plaintiff reported Vicodin was no longer controlling his pain but that an Endocet he had taken from his wife had worked very well. Plaintiff asked whether he could use Endocet and also requested a referral to a pain specialist. Dr. Wiggers noted Plaintiff was in no apparent distress, had a normal gait, was negative on the straight-leg raising test and that his back was not particularly tender to palpation. Dr. Wiggers prescribed Endocet and continued Plaintiff on allopurinol for this gout but declined to refer him to a pain specialist, noting that from a health perspective he was "not sure that a pain specialist would have much to add at this point."

During a clinic visit on July 14, 2009, Plaintiff reported muscle spasms and low back pain as well as bilateral knee pain. Dr. Wiggers encouraged Plaintiff to quit his use of tobacco and continue his weight loss, prescribed "a few" Percocet with no refill and suggested that Plaintiff use primarily ibuprofen.

OPINION AND ORDER – 5

On October 12, 2009, Plaintiff reported intermittent, diffuse low back pain.  Dr. Wiggers noted that Plaintiff appeared protective of his back and was shuffling, although in a "symmetrical shuffle."  Dr. Wiggers noted tenderness over the paravertebral muscles, refilled Plaintiff's prescriptions for Percocet and Flexeril and prescribed a short course of prednisone to decrease local inflammation.

At the request of the Agency, Dr. Thomas Brent Shields, Ph.D., performed a comprehensive psycho-diagnostic consultative examination of Plaintiff on November 9, 2009. Dr. Shields noted that Plaintiff's grooming and hygiene were adequate, his gross and fine psychomotor activity unremarkable, his gait slow with mild pain behavior, his affect appropriate and that he appeared mildly anxious but that his mood was more euthymic as the evaluation progressed.  Plaintiff reported that his ability to work was limited by lower back problems, knee problems, gout and anxiety and depression.  Plaintiff reported that he was in pain and that he didn't like to be around crowds of people but liked to stay home.  Dr. Shields noted that Plaintiff admitted he had a history of methamphetamine, cannabis and alcohol abuse and had never been diagnosed or treated for a mental disorder or taken any psychotropic medications.  Based on Plaintiff's self-report, Dr. Shields assessed Plaintiff as independent in his daily living skills but that he could not do household chores except to take a small kitchen garbage bag outside and standing at the counter in order to prepare a meal hurt his back.  Dr. Shields diagnosed Plaintiff with anxiety disorder not otherwise specified, adjustment disorder with anxiety and depressed mood related to his current living and financial situation and pain complaints.

In notes of a visit on December 29, 2009, Dr. Wiggers noted that results of an MRI taken on December 21, 2009 revealed mild degenerative disk disease at the L4-5, L5-S1 levels with facet spondylosis at these levels as well, but no compression fracture, disk protrusion, spinal

stenosis or significant neural foraminal narrowing.  Dr. Wiggers noted that Plaintiff "states however that his pain is quite severe" and that he often took more than one Percocet daily.  Dr. Wiggers prescribed a one month supply of Percocet with no refills, provided Plaintiff with samples of Aleve and suggested that Plaintiff try Naprosyn to provide better pain control than ibuprofen.

In a visit to the Grants Pass Clinic on January 21, 2010, Plaintiff reported that his left knee was swollen and painful and that the pain felt like gout.  Plaintiff reported that he had been taking his allopurinol as prescribed and had not had fevers or chills but had been "moving a lot more firewood in the last few days."  Upon examination, Plaintiff's left knee was slightly swollen with ballotable fluid and mild tenderness along the medial and lateral joint lines as well as posteriorly.  Dr. Caroline Brown, M.D. opined that this was likely a traumatic effusion from excessive twisting and squatting although it was possible that it was gout.  Plaintiff was reluctant to allow a fluid draw to confirm a diagnosis and requested a short course of prednisone.  Dr. Brown concluded that this course of treatment was reasonable.  However, she noted that Plaintiff smelled of alcohol and cautioned him about the gastric effects of combining alcohol, ibuprofen and prednisone.

On February 1, 2010, Michael O'Connell, Ph.D., conducted an independent psychological assessment of Plaintiff.  Dr. O'Connell reviewed Plaintiff's records, interviewed Plaintiff, summarized Plaintiff's medical and psychological history, conducted a mental status examination and psychological testing and set out his diagnoses.  Dr. O'Connell described Plaintiff's grooming and hygiene as "satisfactory," his social skills as "adequate," and his affect as depressed with restricted range.  He noted that Plaintiff's description of past substance abuse

differed "dramatically" from the information that Dr. Shields reported receiving from Plaintiff during his November 2009 evaluation.

Dr. O'Connell assessed Plaintiff's reasoning abilities on verbal tasks in the low average range and his nonverbal reasoning abilities as "significantly higher" and in the average range; he assessed Plaintiff's ability to sustain attention, concentrate and exert mental control in the low average range and his ability to process simple or routine visual material without error as borderline. Dr. O'Connell's report included his diagnostic impression that Plaintiff had "intellectual ability within normal limits, except for slowed processing speed;" pain disorder associated with psychological factors and a general medical condition; anxiety disorder, NOS; rule-out social anxiety disorder; and dysthymia. Dr. O'Connell opined that Plaintiff's working ability was impacted by "two primary factors: chronic pain and persistent social anxiety."

At the request of Plaintiff's counsel, Dr. Robin Rose, M.D. conducted a consultative examination on September 9, 2010. In her notes from the one-time 50 minute examination, Dr. Rose noted that Plaintiff appeared emotionally stable and in no acute distress, walked stiffly to the examination room without difficulty, was able to transfer from the chair to the examination table easily and sat comfortably but was not able to take off his shoes without difficulty. Dr. Rose reported Plaintiff stepped carefully with knees bent and was unable to heel walk or toe walk due to knee pain. General findings indicated moderate lumbar paravertebral muscle spasms with palpable tenderness but no crepitus, effusions, deformities or trigger points. Muscle strength was 5/5 throughout; straight leg raising was positive at 30 degrees bilaterally; there was no evidence of foot drop; back range of motion was measured at 25 degrees extension, 75 degrees flexion and 20 degrees lateral flexion. Dr. Rose's report indicated that Plaintiff denied past or current tobacco or recreational drug use and denied current alcohol use. Dr. Rose

diagnosed Plaintiff with chronic lumbar degenerative disk and joint disease, status post distant accident and history of work-related microinjuries; chronic knee pain; gout; slowed processing speed and anxiety/dysthymia with social phobia and panic attacks.

On March 24, 2011, Plaintiff was treated by Linda Picker-Johnson, ANP-BC. Picker-Johnson noted that Plaintiff was being treated for hypertension and hyperlipidemia and had "no additional complaints." She opined that Plaintiff's blood pressure had been poorly controlled on current medications. She noted that Plaintiff appeared alert and oriented and in no acute distress, had normal gait and was able to stand without difficulty, showed normal muscle mass, tone and strength for his age and that his mood and affect were normal and appropriate.

In chart notes of a follow-up visit dated April 25, 2011, ANP Picker-Johnson noted that Plaintiff was tolerating new medications well and denied any other complaints.

On June 8, 2011 Plaintiff complained of a productive cough, shortness of breath and wheezing. ANP Picker-Johnson noted that Plaintiff's oxygen saturation was down to 91%. Plaintiff was administered a nebulizer treatment in the office and prescribed albuterol, prednisone and a nebulizer to use at home.

In notes of a visit dated July 11, 2011, ANP Picker-Johnson indicated that Plaintiff was still using a nebulizer once a day and "seems to be getting better." She characterized Plaintiff's visit as a follow up on COPD (chronic obstructive pulmonary disease) problems and prescribed an albuterol inhaler. Plaintiff complained of social anxiety and nervousness when out in public and asked if there was a medication that could be prescribed him to help with the symptoms. Plaintiff was prescribed Paxil 20 mg and directed to take half a pill daily for a week then increase to one pill daily.

## Testimony

### Plaintiff

Plaintiff testified as follows at the hearing before the ALJ.

Plaintiff's last job, which lasted two years, was as a heavy equipment operator building subdivisions.   Before that all his work was in logging and tree climbing.  Plaintiff's last job ended because it was too painful for him to get on and off the equipment and he was being "jarred around on the heavy equipment."  Plaintiff tried to find lighter work through his brother, who is in the tree service industry, but other than distributing flyers on a couple of occasions there were "no light duties to do."  Plaintiff tried flagging work while he was working for the excavation company but was unable to stand for long periods on concrete.

Plaintiff lives with his wife.  Firewood is the sole source of heat for their home and Plaintiff spends about 30 to 45 minutes each day stacking already cut firewood that his brothers provide from their tree service companies.  Plaintiff stacks the wood and then carries or takes it by wheelbarrow into the house.  Plaintiff spends the remainder of his time during the day watching television and sitting on his back porch, doing "really not a whole lot."  Plaintiff has a driver's license and was able to drive himself to the hearing.  On his wife's days off from work, he and his wife will go for a drive.  Plaintiff has a disability permit which allows him to hunt from the sides of the road.  He helps with the vacuuming at home and barbecues twice a week but he can't stand on his feet long and be bent over a stove or sink before it starts causing him "severe pain."

Plaintiff can sit for about 20 to 30 minutes but then needs to stand up and move around for 10 to 15 minutes before he can sit back down.  Standing in the aisle at the supermarket hurts his back.  When Plaintiff's knees swell, he puts his legs up and ices them intermittently through

the day for a total of 40 minutes in a day.  Plaintiff testified that the pain and swelling are alleviated "pretty fast" by prednisone and ibuprofen but will sometimes last four to eight weeks. He has sleep issues because of pain.

Plaintiff testified that because he stays at home so much and has worked all his life in the woods without being around more than one or two people, he gets nervous and uncomfortable and can't concentrate when he is around a lot of people.  Plaintiff's primary care physician prescribed him Paxil for anxiety the month before the hearing "to see if it would help."

**Vocational Expert**

The ALJ posed a vocational hypothetical describing a younger individual with impairments that would limit the individual to sedentary work subject to the following limitations:  work would be limited to unskilled; would allow either the ability to change positions from sitting to standing every 30 minutes or to perform the work either sitting or standing as needed; and required no more than occasional dealings with the public or coworkers.

The VE testified that such an individual could work as a hand sorter, an assembler or a bench packager.  He testified that these jobs could be performed either sitting or standing.  The VE testified that although the Dictionary of Occupational Titles (DOT) does not directly address the need to change position, based on his experience these jobs could be performed by someone who had to stand and change position every 30 minutes.  The VE testified that an individual who missed more than two days of work a month would not be able sustain competitive employment.

In response to questioning by Plaintiff's counsel, the VE testified that there would be no work available for an individual in the same hypothetical as above but who had to move away from the work station for at least 15 minutes every 30 minutes.

OPINION AND ORDER – 11

**ALJ's Decision**

The ALJ found that Plaintiff met the requirements for DIB insured status through March 31, 2009.

At the first step of the disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability in January 2009.

At the second step, the ALJ found that Plaintiff's status post effusions and degenerative changes of the bilateral knees, low back pain due to mild degenerative disc disease, anxiety disorder, and adjustment disorder with anxiety and depressed mood were severe impairments within the meaning of 20 C.F.R. 404.1520(c) and 20 C.F.R. 416.920(c).

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a presumptively disabling impairment set out in the listings, 20 C.F.R. Part 404, Subpart P., App. 1.

The ALJ next assessed Plaintiff's residual functional capacity (RFC). He found that Plaintiff retained the capacity to perform sedentary work with an at-will sit/stand option; involving only unskilled work and requiring only occasional dealings with the public and co-workers. In reaching this conclusion, the ALJ found that, overall, the medical record did not support Plaintiff's allegation that he is disabled, and that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC assessment.

Based upon the testimony of the VE, at the fourth step, the ALJ found that Plaintiff could not perform his past relevant work as a logger or a tree trimmer.

At the fifth step of his disability analysis, the ALJ found that Plaintiff could perform other jobs that existed in substantial numbers in the national economy. Based on the testimony

of the VE, the ALJ cited hand sorter, assembler and bench packager.  In reaching his conclusion

the ALJ noted that the VE's testimony was inconsistent with the information contained in the

Dictionary of Occupational Titles (DOT) because of the sit/stand option, but found it

nevertheless reliable based on the VE's knowledge and experience.  The ALJ concluded that

Plaintiff was capable of making a successful adjustment to other work that existed in significant

numbers in the national economy.  Accordingly, he found that Plaintiff was not disabled within

the meaning of the Act.

### <u>Standard of Review</u>

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by

reason of any medically determinable physical or mental impairment which . . . has lasted or can

be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  Claimants bear the initial burden of establishing disability.  <u>Roberts v. Shalala</u>, 66

F.3d 179, 182 (9th Cir. 1995), <u>cert.</u> <u>denied</u>, 517 U.S. 1122 (1996).  The Commissioner bears the

burden of developing the record,  <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 849 (9th Cir. 1991), and

bears the burden of establishing that a claimant can perform "other work" at Step Five of the

disability analysis process.  <u>Tackett</u>, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record as a whole.

42 U.S.C. § 405(g); <u>see</u> <u>also</u> <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

<u>Andrews</u>, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or

detracts from the Commissioner's decision.  <u>Martinez v. Heckler</u>, 807 F.2d 771, 772 (9th Cir.

1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

### Discussion

Plaintiff contends that the ALJ improperly rejected the opinions of examining physicians Dr. Michael O'Connell and Dr. Robin Rose; failed to adequately support his conclusion that Plaintiff was not wholly credible; improperly substituted his own opinions, medical findings and inferences for those of Plaintiff's treating and examining physicians; failed to properly consider the combined effects of Plaintiff's multiple impairments, and failed to pose a vocational hypothetical that set out all of Plaintiff's limitations.

1.  **Plaintiff's Credibility**

As noted above, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not wholly credible.  Plaintiff contends that the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's pain and other subjective symptom testimony.

**Evaluating A Claimant's Credibility**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  Andrews, 53 F.3d at 1039.  If a claimant produces medical evidence of an underlying impairment that is reasonably expected to produce some degree of the symptoms alleged, and there is no affirmative evidence of malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility determination.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).  An ALJ must also specifically identify evidence that undermines a claimant's testimony.  See Morgan v.

Commissioner, 169 F.3d 595, 599 (9th Cir. 1999) (ALJ making adverse credibility finding must identify testimony undermining credibility).

In evaluating a claimant's credibility, an ALJ must examine the entire record and consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7.   An ALJ may also consider such factors as a claimant's inconsistent statements concerning symptoms and other statements that appear less than candid, unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment, medical evidence tending to discount the severity of the claimant's subjective claims, and vague testimony as to the alleged disability and symptoms. Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008).

If substantial evidence supports the ALJ's credibility determination, it must be upheld, even if some of the reasons cited by the ALJ are not correct. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir. 2008).

**Analysis**

Here, there was objective medical evidence that Plaintiff's impairments would cause some degree of symptoms, and there was no evidence of malingering. The ALJ therefore was required to provide clear and convincing reasons supporting his conclusion that Plaintiff was not wholly credible.

Careful review of the ALJ's decision and the record supports the ALJ's credibility determination. The ALJ based his credibility assessment on inconsistencies between Plaintiff's statements and allegations and other evidence in the record, including evidence in the medical

record and evidence concerning Plaintiff's activities.    These reasons are supported by the record, and are sufficient.

An ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies between the claimant's complaints and the claimant's activities of daily living. Thomas v. Barnhart, 278 F.3d 947, 958–59 (9th Cir. 2002).  In evaluating Plaintiff's credibility, the ALJ cited activities of daily living that were inconsistent with Plaintiff's testimony concerning the severity of his symptoms and impairments.  He noted that Plaintiff barbecues twice a week, and was able to stack firewood, hunt from the road, drive a car, handle his finances independently and care for his personal needs without problem.

In his discussion of the medical record evidence, the ALJ also noted that there were reported inconsistencies in statements Plaintiff gave to medical providers regarding his history of methamphetamine and cannabis use.  The consistency of a claimant's statements, "both internally and with other information in the case record" is a "strong indication of the credibility of an individual's statements," SSR 96–7; See also, Carmickle, 533 F.3d at 1161.

Inconsistencies between a claimant's allegations and relevant medical evidence can also provide a "clear and convincing" basis for rejecting a claimant's testimony. E.g., *Tonapetyan* v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). Here, the ALJ noted that though Plaintiff testified that he could not work because of low back pain and knee pain,  the medical record showed objective findings that were "mild at most."  A 2009 MRI revealed mild degenerative disk disease but no evidence of a compression fracture, disc protrusion, spinal stenosis or significant neural foraminal narrowing.  Plaintiff's complaints of knee pain and swelling during a January 21, 2010 clinic visit were preceded by Plaintiff admittedly having moved "a lot more firewood in the last few days."  All chart notes in the record from 2011 report that Plaintiff had normal

strength and tone throughout, exhibited normal gait and was able to stand without difficulty. The ALJ also correctly noted that one of Plaintiff's treating physicians, Dr. Wiggers, continued to prescribe only conservative treatment for Plaintiff's allegedly disabling back and knee impairments.  This observation supported the ALJ's credibility determination. See Parra v. Astrue, 481 F.3d 742, 750–51 (9th Cir. 2007) (citations omitted) (conservative treatment can be sufficient basis to discount claimant's testimony as to severity of symptoms).  Based upon these factors, the ALJ reasonably concluded that Plaintiff's lower back and knee problems were not as severe as Plaintiff alleged.

Plaintiff contends that the ALJ erred in discounting Plaintiff's credibility on the basis that his allegations of pain were not supported by objective medical evidence.  However, as the Commissioner correctly notes, though an ALJ cannot reject a claimant's pain testimony *solely* because it is not supported by the objective medical evidence, medical evidence *is* a relevant factor in determining the severity of a claimant's pain. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).  Here, the ALJ did not rely only on a lack of supporting objective medical evidence, and set out substantial reasons for concluding that Plaintiff's subjective complaints were not wholly credible in light of the medical evidence. Under these circumstances, an absence of objective medical evidence supporting Plaintiff's subjective complaints was relevant to the ALJ's credibility determination.

In support of his credibility determination, the ALJ also noted that though Plaintiff alleged anxiety and depression as disabling impairments, the medical record reflected no consistent treatment for any mental disorder and Plaintiff himself testified that he had not sought treatment because he did not think his symptoms were a problem.  This observation supported the ALJ's credibility determination, because the amount of treatment a claimant seeks is "an

important indicator of the intensity and persistence of ... symptoms." 20 C.F.R. §§ 404.1529(c)(3), 416 .929(c)(3); see Burch v. Barnhart, 400 F.3d 676, 681 (9ᵗʰ Cir. 2005) (lack of consistent treatment may support adverse credibility determination).

Plaintiff argues that it was error for the ALJ to discount Plaintiff's credibility based on what the ALJ contended was "benefit seeking behavior."  In support of his credibility determination, the ALJ noted that Plaintiff had previously applied for and been denied disability benefits, had received various State benefits including food stamps and that during the time he was earning wages, those wages were being garnished for payment of child support.   However, any motivation Plaintiff had to obtain disability benefits in and of itself does not provide a legitimate basis for discounting Plaintiff's credibility.  Every claimant applies for benefits with the knowledge and intent that a favorable determination will result in pecuniary gain. E.g., Ratto v. Secretary, 839 F.Supp. 1429, 1429 (D. Or. 1993). If the expectation of financial gain were a sufficient basis for discounting a claimant's credibility, "no claimant ... would ever be found credible." Id.

Nevertheless, even accepting that the ALJ erred in this respect, there is substantial evidence to support the ALJ's credibility determination, the ALJ articulated other reasons that were clear and convincing for finding Plaintiff's testimony less than wholly credible, and any error noted above, was harmless. See Stout v. Comm'r, Social Sec. Admin., 454 F.3d 1050, 1055 (9ᵗʰ Cir. 2006) (recognizing harmless error applies in the social security context); and Batson v. Comm'r, Soc. Sec. Admin., 359 F .3d 1190, 1197 (9ᵗʰ Cir. 2004) (holding harmless ALJ's partial reliance on assumption unsupported by the record where ALJ gave numerous other record-supported reasons for credibility finding).

The ALJ here adequately supported his conclusion that Plaintiff's statements concerning the severity of his symptoms and impairments were not wholly credible.

2. **ALJ's Evaluation of Opinions of Examining Drs. O'Connell and Rose**

The opinion of an examining physician is entitled to greater weight than the opinions of a non-examining physician. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining physician, id., and must provide specific and legitimate reasons which are supported by substantial evidence in the record for rejecting opinions of an examining physician that are contradicted by another physician. Andrews, 53 F.3d at 1043.

The ALJ, however, need not accept a treating physician's opinion if it is conclusory, inadequately supported by clinical findings, or pertains to a matter not related to his or her area of specialization. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); 20 C.F.R. § 404.1527(d).

a. **Dr. O'Connell**

As noted above, Michael O'Connell, Ph.D., conducted an independent psychological assessment of Plaintiff on February 1, 2010.

In his decision denying Plaintiff's claim, the ALJ reviewed Dr. O'Connell's report and gave it very little weight overall. The ALJ noted that although Dr. O'Connell assigned Plaintiff a Global Assessment of Functioning (GAF) score of 60, indicating only moderate symptoms, he went on to opine that Plaintiff had marked impairments in activities of daily living and social functioning. The ALJ also accurately noted that Dr. O'Connell explicitly stated that this assessment was based on the claimant's subjective report of symptoms.

OPINION AND ORDER – 19

Plaintiff asserts Dr. O'Connell's finding of two "marked" restrictions "carries Plaintiff's burden of proving he is disabled based on his mental disorder of anxiety alone. . ." However, though Plaintiff asserts that the ALJ improperly rejected Dr. O'Connell's opinion, he has offered no argument supporting this contention and thus it is deemed waived.  See, e.g., Carmickle, 553 F.3d at 1161 n.2 (courts will not consider matters not specifically argued in opening brief).  In any event, careful review of the record leads me to conclude that the ALJ here provided specific and legitimate reasons for discounting Dr. O'Connell's opinion and they are supported by the record.

b. **Dr. Rose**

A noted above, Dr. Robin Rose conducted a medical evaluation of Plaintiff on September 9, 2010 at the request of Plaintiff's counsel.  Dr. Rose opined that Plaintiff was limited to standing/walking for two hours in an eight-hour workday, and sitting for four hours in an eight-hour workday with breaks every thirty minutes for a position change; could lift ten pounds frequently and twenty pounds occasionally, and could only occasionally climb, stoop and crouch and never kneel or crawl.  Dr. Rose also included a manipulative limitation due to gout and environmental limitations.

In his decision denying Plaintiff's claim, the ALJ reviewed Dr. Rose's report and gave it very little weight overall.  The ALJ asserted that Dr. Rose was not a treating source and her opinion was based on a one-time examination that was arranged by Plaintiff's counsel "not in an attempt to seek treatment for symptoms, but rather . . .  in connection with an effort to generate evidence for the current appeal;" that Dr. Rose relied "quite heavily" on the Plaintiff's subjective report of symptoms and limitations, and that her opinion was not consistent with the objective medical evidence or with Plaintiff's activities of daily living.

As was mentioned above, Dr. Rose reported that Plaintiff appeared emotionally stable and in no acute distress, walked stiffly to the examination room without difficulty, was able to transfer from the chair to the examination table easily and sat comfortably but was not able to take off his shoes without difficulty.  Dr. Rose reported Plaintiff stepped carefully with knees bent and was unable to heel walk or toe walk due to knee pain.  General findings indicated moderate lumbar paravertebral muscle spasms with palpable tenderness but no crepitus, effusions, deformities or trigger points.  Muscle strength was 5/5 throughout, straight leg raising was positive at 30 degrees bilaterally, there was no evidence of foot drop, back range of motion was measured at 25 degrees extension, 75 degrees flexion and 20 degrees lateral flexion.

As the ALJ noted, Dr. Rose's report also contained "extensive" notes about the Plaintiff's subjective complaints.  A careful review of Dr. Rose's report fully supports the ALJ's assertion that Dr. Rose relied in large measure on Plaintiff's subjective allegations concerning his symptoms.  This is significant because, where, as here, a claimant's credibility has been properly discounted, an ALJ may also discount medical opinion that is based upon a claimant's subjective complaints.  See Tonapetyan, 242 F.3d at 1149; Morgan, 169 F.3d at 602 (doctor's opinion premised on claimant's accounts of symptoms and limitations may be disregarded if claimant's complaints properly discounted); Bray v. Commissioner, 554 F.3d 1219, 1228 (9th Cir.1999). As noted above, the medical records are inconsistent with Plaintiff's allegations, and the ALJ provided legally sufficient support for his finding that Plaintiff was not wholly credible.

The record also supports the ALJ's conclusion that Plaintiff's activities of daily living and the objective medical evidence of record were not consistent with the level of impairment to which Dr. Rose opined.  As discussed above, the ALJ noted that Plaintiff was able to spend time

stacking wood and sitting on his porch, barbecued twice a week, and was able to drive, hunt from

the road, care for his personal needs without problem and perform other activities of daily living

that indicated a higher level of function than Dr. Rose found.  These activities supported the

ALJ's rejection of Dr. Rose's opinion.  E.g., Morgan, 169 F.3d at 602–03 (ALJ may reject

doctor's opinion inconsistent with claimant's activities).

The ALJ's reference to the absence of other objective evidence in the record supporting

the severity of the impairment assessed by Dr. Rose also supports his discounting of her opinion.

In his summary of the medical evidence, the ALJ noted that there was a "paucity of evidence" in

the medical record supporting the Plaintiff's alleged impairments, that Plaintiff's treating

physicians routinely prescribed conservative treatment for Plaintiff's alleged symptoms and that

tests returned only mild results.  The ALJ also noted that Plaintiff's most recent treatment notes,

which post-dated Dr. Rose's report, were "unremarkable" and described Plaintiff as having

normal strength and tone throughout, normal gait and able to stand without difficulty.  These

observations were not the ALJ's own medical findings, opinions or "speculative inferences," as

Plaintiff suggests but an accurate review and assessment of the relevant medical evidence

contained in the record.  See Tommasetti, 533 F.3d at 1041 (ALJ required to consider all medical

opinion evidence, and is responsible for resolving conflicts and ambiguities in the medical

testimony).

The ALJ, here, provided specific and legitimate reasons for discounting Dr. Rose's

opinion, and they are supported by substantial evidence in the medical record.

Plaintiff argues that the ALJ erred to the extent he discounted Dr. Rose's opinion because

her examination of Plaintiff was arranged through "attorney referral."  In general, the fact that an

examination was provided at the request of a claimant's attorney does not justify rejecting

medical opinion unless "the opinion itself provides grounds for suspicion as to its legitimacy."

Nguyen v. Chater, 100 F.3d 1462, 1464 (9th Cir. 1996).  Here, the ALJ identified no evidence in

the record to support a conclusion that the information in Dr. Rose's opinion was provided for an

inappropriate reason.  See Lester v. Chater, 81 F.3d 821, 832 (9th Cir.1995) (concluding that

evidence of actual improprieties must be shown since "[t]he Secretary may not assume that

doctors routinely lie in order to help their patients collect disability benefits").  In this case,

however, Dr. Rose's assessment of Plaintiff's limitations are not supported by other evidence in

the record or even, to a large extent, her own report, which does raise questions about its

legitimacy.  In any event, as discussed above, the ALJ supported his rejection of Dr. Rose's

opinion with other specific, legitimate reasons supported by substantial evidence.  Thus, even if

it was error for the ALJ to cite the context of the report as a basis for rejecting it, such error was

harmless.

3. **ALJ's Step Three Equivalence Analysis**

At step three the ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of a listed impairment.  Plaintiff argues

that the ALJ did not properly consider the combined effects of Plaintiff's multiple impairments

which, when considered together, meet or equal a listed impairment or "result in limitations of

disabling severity."  Specifically, Plaintiff argues Dr. Rose's and Dr. O'Connell's opinions each

considered alone were enough to support a finding of disability and that, taken together, they

"certainly" compel such a finding.

The record before the court does not support these contentions.  An ALJ is required to

discuss whether an impairment or combination of impairments equals an impairment in the

Listing only if the claimant presents evidence supporting equivalence.  Burch, 400 F.3d at 693.  A

Plaintiff challenging an ALJ's equivalency determination must specifically identify why his impairments or combination of impairments meet or equal a listed impairment, see Carmickle v. Commissioner, 533 F.3d at 1161 n. 2; and courts will not find that an ALJ has erred in determining whether combined impairments meet or equal a listed impairment unless the Plaintiff offers a plausible theory of medical equivalency. See, Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir.2001); 20 C.F.R. §§ 404.1526, 4168.926. Here, Plaintiff did not present evidence of equivalence to the ALJ, and the ALJ thoroughly discussed and evaluated the relevant medical evidence. As discussed above, the medical opinions upon which Plaintiff now relies to support his theory of medical equivalency or "limitations of disabling severity" were properly discounted by the ALJ.  The ALJ's evaluation fully supported the conclusion that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment.  Under these circumstances, Plaintiff's challenge to the ALJ's analysis at Step 3 fails.

4. **Adequacy of ALJ's Vocational Hypothetical**

In order to be accurate, an ALJ's vocational hypothetical presented to a VE must set out all of a claimant's impairments and limitations. E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The ALJ's depiction of a claimant's limitations must be "accurate, detailed, and supported by the medical record." Tackett, 180 F.3d at 1101.  If the assumptions set out in the hypothetical are not supported by the record, a VE's conclusion that a claimant can work does not have evidentiary value. Gallant, 753 F.3d at 1456.

Plaintiff contends that the ALJ's vocational hypothetical did not satisfy this standard because it did not include the limitation described in the hypothetical that Plaintiff's attorney posed to the VE of an individual who would have to move away from his workstation every 30 minutes for at least 15 minutes.  As noted above, the VE testified that there would be no work

OPINION AND ORDER – 24

available for an individual with this limitation.  Plaintiff contends that the ALJ erred in

disregarding this testimony.  I disagree.  For the reasons discussed above, I conclude that the

ALJ's hypothetical included all of the limitations that were established by the record.  Thus, the

VE's testimony in response to the ALJ's hypothetical had evidentiary value and the ALJ was

entitled to rely upon that testimony in reaching a disability determination.

## <u>CONCLUSION</u>

For the reasons set out above, the Commissioner's decision is AFFIRMED and this

action is dismissed with prejudice.


DATED this 26th day of February, 2014.



    /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge

OPINION AND ORDER – 25